```
1                          SUPERIOR COURT OF NEW JERSEY
                           LAW DIVISION, CRIMINAL PART
2                          UNION COUNTY, IND.NOS. 04-10-01267
                   04-10-01268, 04-10-01269, 04-10-01303,
3                  04-10-01305, and 04-10-01389
                           A.P. #
4    STATE OF NEW JERSEY              )
                                      )
5             v.                      )
                                      )  Stenographic Transcript
6    JONATHAN BLACK, ROBERT BENNET,  )
     ERNEST OLIVER, KEVIN D. DRAKE   )
7    and TARIQ McLAMB,                )
                                      )     MOTION TO SUPPRESS
8             Defendants.             )

9                          PLACE:  Union County Courthouse
                                   2 Broad Street
10                                  Elizabeth, N.J. 07207
                           DATE:   June 1, 2005
11   B E F O R E:

12        THE HONORABLE WILLIAM L'E. WERTHEIMER, J.S.C.

13   TRANSCRIPT ORDERED BY:
          OFFICE OF THE PUBLIC DEFENDER.
14        BY:  JEFFREY SAGOTSKY
               Deputy Public Defender

15   A P P E A R A N C E S:

16        SARA LIEBMAN, ESQ. (Ass't Prosecutor Union County)
          For the State
17
          DONALD ROSANELLI, ESQ. (Joseph Ferrante, Esq.)
18        For the Defendant Black

19        JAMES F. FRIEDMAN, ESQ. (James F. Friedman, Esq.)
          For the Defendant Oliver
20
          JOSEPH O. ROTELLA, ESQ. (Joseph O. Rotella, Esq.)
21        For the Defendant Drake

22        BRIAN McCORMACK, ESQ. (Ass't Dep. Public Defender)
          For the Defendant McLamb
23
                    JUDITH L. DiANTONIO, C.S.R.
24                       2 Broad Street
                     Union County Courthouse
25                 Elizabeth, New Jersey 07207
```

FILED, Clerk of the Appellate Division, September 06, 2018, A-004150-16

2

1

I N D E X

2 | WITNESS | PAGE
PIETRO DiGENA, JR.

3     Direct examination by Ms. Liebman | 4
    Cross-examination by Mr. Rosanelli | 13

4     Cross-examination by Mr. Friedman | 15
    Cross-examination by Mr. Rotella | 19

5     Redirect examination by Ms. Liebman | 25
    Recross-examination by Mr. Friedman | 27

6

7 FRANK MARANO
    Direct examination by Ms. Liebman | 28
    Cross-examination by Mr. Friedman | 39

8     Cross-examination by Mr. Rotella | 40

9

10 | EXHIBITS | DESCRIPTION | IDENT. | EVID.

11 | S-13 | Police report | 25
| S-14 | Police report | 38

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED, Clerk of the Appellate Division, September 09 2019, A-004150-16

1              JUNE 1, 2005

2              THE COURT:  Mr. Zeigler called my chambers

3     just a few minutes ago and spoke with Anna Maria.

4     Mr. Zeigler called and said his client is not

5     participating in this motion because they had no

6     interest in it.  So those proofs you don't have to

7     worry about.

8              Appearances for the record, Counsel.

9              MR. ROSANELLI:  Good morning, sir.

10             From the office of Joseph Ferrante, Donald

11    Rosanelli for defendant Jonathan Black.

12             MR. FRIEDMAN:  Good morning.

13             James Friedman representing Ernest Oliver.

14             MR. ROTELLA:  Joseph Rotella on behalf of

15    Kevin Drake.

16             MR. McCORMACK:  Brian McCormack for Tariq

17    McLamb.

18             MS. LIEBMAN:  Sara Liebman for the State.

19             THE COURT:  Anybody who will testify, wait

20    outside and we will come and get you, except the

21    parties.

22             Call your first witness.

23             MS. LIEBMAN:  The State calls Officer DiGena.

24    P I E T R O    D i G E N A,   J R., sworn.

25    DIRECT EXAMINATION BY MS. LIEBMAN:

1        Q      By whom are you employed?

2    A    Union Police Department.

3        Q      How long have you been employed there?

4    A    Since July 2002.

5        Q      In what capacity?

6    A    Police officer.

7        Q      I want to direct your attention now to April

8    28th of 2004.   Were you working on that date?

9    A.   Yes.

10       Q      At approximately 12:23 a.m. were you working?

11    A    Yes.

12       Q      Where were you?

13    A    Morris Avenue.

14       Q      Was that in a patrol car?

15    A    Yes.

16       Q      Were you with a partner?

17    A    Yes.

18       Q      Who is that?

19    A    Officer Barry Cohen.

20       Q      Were you in uniform?

21    A    Yes.

22       Q      At that time what, if anything, did you see

23    that drew your attention?

24    A    We observed a vehicle that matched the description

25    of a vehicle involved in an armed robbery from the

1   night before.

2           Q    Where had that robbery occurred?

3   A    At the Foot Locker store, 1230 Morris Avenue,

4   Union.

5           Q    Were you involved in any way in the

6   investigation of that robbery?

7   A    Yes.

8           Q    What had you done?

9   A    Approximately four hours prior to observing that

10  vehicle, I took a report from the manager at the Foot

11  Locker store that -- the information of the suspect

12  vehicle wasn't obtained until the night after the

13  robbery.  The night of the robbery they didn't have

14  information on the vehicle used.

15          Q    Okay.  What date did the robbery at the Foot

16  Locker occur?

17  A    I believe it was the 26th.

18          Q    Was it on the 27th you spoke to the manager?

19  A    Yes, it was the next day.

20          Q    What information did the manager give you at

21  that time?

22  A    He advised me that a customer came into the store,

23  that he tried to enter the store while the store was in

24  the process of being robbed, and they were turned away

25  by the actors inside the store.  When he turned to his

FILED, Clerk of the Appellate Division, September 09, 2019, A-004150-16

1   car, he noticed the vehicle that was partially blocking

2   the exit and he gave the manager a detailed description

3   of the vehicle.

4       Q    Did the manager then relay that description

5   to you?

6   A    Yes.

*[handwritten annotation: that is hear say that is 3rd person wt now that the police offi is now talkin about]*

7       Q    What was that description?

8   A    He said it was a 1995 -- specifically, a 1995

9   Mitsubishi Galant, silver, with gray tinted windows,

10  and damage to the right front fender and the headlight

11  was broken, right front headlight.

12      Q    And at approximately what time did you obtain

13  this information on the 27th?

14  A    I would say approximately 7:30 or 8:00 at night.

15      Q    And then you had indicated earlier that you

16  saw a car that matched this description?

17  A    Yes.

18      Q    And this was at approximately 12:23 a.m. on

19  April 28th?

20  A    Yes.

21      Q    Where did you see that car?

22  A    On Morris Avenue in Union, in the area of Sterling

23  Road.

24      Q    And what about the car drew your attention to

25  it?

FILED, Clerk of the Appellate Division, September 09 2019, A-004150-16

1    A    Well, first that it was a Mitsubishi Galant.

2    Second, the color matched, tinted windows matched, the

3    damage matched to the passenger side front and the

4    light was also out.

5         Q    After seeing that car, what did you do?

6    A    We made a U-turn.  The car was traveling

7    westbound, we were traveling eastbound.  We made a

8    U-turn and a short time later performed a motor vehicle

9    stop.

10        Q    Were you driving the car or was your partner

11   driving the car?

12   A    I was driving.

13        Q    Were you, in fact, able to stop the car?

14   A    Yes.

15        Q    This was by turning on your overhead lights?

16   A    Yes.

17        Q    What happened after you stopped the car?

18   A    When we stopped the car, we, over our P.A.

19   system -- first we requested backup.  We advised

20   headquarters or dispatch of the stop and our location

21   and then requested backup.  And we then got over the

22   P.A. system and advised them to roll down the windows

23   so we can see better in the car.

24        Q    Did the occupants, in fact, do that?

25   A    Yeah, they did.

DiGena - Direct                                              8

1      Q     By the way, did you have any description of

2  the actors of the robbery?

3  A     From the night before from Foot Locker, yes.  One

4  of the actors was wearing a green military jacket,

5  olive green military jacket.  And the second one wore a

6  black hooded sweatshirt.

7      Q     Was there any other information about the

8  Foot Locker robbery that you were given prior to seeing

9  this car on the 28th?

10  A     Both armed with handguns.

11      Q     Okay.

12  A     And it matched similar MO to other robberies in

13  recent weeks. → *How was it similar*

14      Q     Also in Union?

15  A     Yes.

16      Q     Now, after advising the occupants of the car

17  to roll down the windows, what did you do?

18  A     We were waiting for backup to arrive.

19      Q     During that time did you make any

20  observations of the occupants of the car?

21  A     Yes.  It appeared that the front passengers were

22  passing something back to the rear seat passengers. *It is*

23      Q     Could you tell how many people were inside *night time with a car with mirror tints so how could it so?*

24  the car?

25  A     There was four.

FILED, Clerk of the Appellate Division, September 09, 2019, A-004150-16

1      Q      Were you making these observations from

2    inside your patrol car or were you outside at this

3    time?

4    A      Inside the car.

5      Q      Approximately how far from the suspect car

6    were you?

7    A      A few feet.

8      Q      The movements that you observed, did those

9    have a significance to you?

10   A      Yes.

11     Q      What was that?

12   A      It appeared they were trying to conceal something.

13     Q      Had you been involved in motor vehicle stops

14   prior to this date?

15   A      Yes.

16     Q      And had you had experience where people were

17   trying to conceal contraband from you?

18   A      Yes.

19     Q      And the movement that you observed on this

20   date, were they similar to prior times when you had

21   made observations of people trying to hide contraband?

22   A      Yes.

23     Q      Did backup units arrive?

24   A      Yes.

25     Q      Approximately how soon after the initial stop

FILED, Clerk of the Appellate Division, September 06, 2014, A-004736-13

DiGena - Direct                                    10

1    would you say?

2    A    I would say within a minute.

3         Q    What happened then?

4    A    We then approached the vehicle.

5         Q    What side, do you recall, did you approach

6    on?

7    A    Driver's side.

8         Q    Did you make any observations at that time?

9    A    Yes.

10        Q    What was that?

11   A    As we approached the vehicle, we can see that the

12   front seat passenger was wearing a green military

13   jacket that matched the description from the armed

14   robbery the night before at Foot Locker.  And the

15   driver was wearing a black hooded sweatshirt that also

16   matched the description.

17        As we got closer and was right outside the

18   windows, we can see masks and gloves on the floor of

19   the vehicle. → Why if we were putting them away
          we would leave masks in plain site

20        Q    And could you make these observations from

21   outside the car?

22   A    Yes.

23        Q    What did you do at that point?

24   A    At that point we asked the driver what they were

25   passing throughout the car. → He asked for License

1         Q     Did he respond to you?

2    A    He said "Nothing."

3         Q     What did do you then?

4    A    At that point each individual, one at a time, was

5    taken out of the car and patted down for weapons. *at gun point*

6         Q     Was anything found at that time?

7    A    No.

8         Q     What happened after that?

9    A    Once the four occupants were out of the vehicle,

10   one of the backup officers checked in the area where

11   the rear seat passenger was reaching behind him and

12   announced that a handgun was found.

13        Q     By the way, did you learn the identity of the

14   occupants of the car?

15   A    Yes.

16        Q     Can you give the names?

17   A    Jonathan Black, Kevin Drake, Ernest Oliver, and

18   Tariq McLamb.

19        Q     Do you see any of them here in court today?

20   A    It's been a while but I think so.

21        Q     Who do you recognize?

22   A    Jonathan Black I believe.  → *He pointed out Ernest instead of me*

23        Q     Anybody else?  Is there anyone else that you

24   recognize from that evening?

25   A    The person seated here (indicating).

1          THE COURT:   Third row back?

2          THE WITNESS:   Yeah.

3      Q    In the black and white shirt?

4   A   In the black and white shirt.

5          The person Kevin Drake in the suit right back

6   there (indicating).

7      Q    And the fourth person?

8   A   Right here (indicating).

9      Q    Do you recognize all of them from the April

10  28th stop? *That was about 11 months before our bullet ever heard the gun*

11  A   Yes.

12     Q    They were inside the vehicle?

13  A   Right.

14     Q    You said that another officer indicated there

15  was a handgun in the car?

16  A   Right.

17     Q    Was the car searched then at that time?

18  A   Yes.

19     Q    Were you part of that search or was that done

20  by another officer?

21  A   That was done by another officer.

22     Q    What did you do then at this time?

23  A   During the search of the car, I was watching the

24  four occupants.

25     Q    Did you -- after the search was conducted,

1    did you -- were the occupants placed under arrest?

2    A    Yes.

3         Q    Were they transported back to headquarters?

4    A    Yes.

5         Q    Were you involved in that transport?

6    A    Yes.

7         Q    Who did you transport back?

8    A    Kevin Drake.

9         MS. LIEBMAN:   No other questions for this

10   officer.

11   CROSS-EXAMINATION BY MR. ROSANELLI:

12        Q    Officer, when you had the four occupants of

13   the vehicle outside of the car, at what distance were

14   they from the car?

15   A    A few feet.

16        Q    And were they seated on the ground, on the

17   curb?

18   A    Yes, the curb I believe.

19        Q    Your weapon was drawn?

20   A    Yes.

21        Q    And was there any other officer with you

22   watching them while the vehicle was being searched?

23   A    Yes.

24        Q    How many others?

25   A    Three to four, I guess. ⟵ more then that

DiGena - Cross - Mr. Rosanelli                    14

1        Q    And did they also have their weapons drawn?

2    A    Yes.

3        Q    You indicated that the manager told you that

4    the Mitsubishi Galant had been involved in a robbery at

5    the Foot Locker, correct?

6    A    Correct.

7        Q    Now, did he indicate that he saw the

8    perpetrators exit the vehicle and enter the Foot Locker

9    store?

10   A    No.

11       Q    Did he indicate that he saw the perpetrators

12   leave the Foot Locker store and enter the vehicle to

13   flee?

14   A    No.

15       Q    So what connects the vehicle to the robbery

16   at the Foot Locker store?

17            MS. LIEBMAN:  Objection.

18            THE COURT:  I'll permit it.

19   A    At the time the store was being robbed, that

20   vehicle was blocking the exit. →so how did he get out?

21       Q    So it was in the area?

22   A    It was in the parking lot of the store. Ho just says
     it was blocking the exit

23            MR. ROSANELLI:  I have nothing further.

24            THE COURT:  Mr. Friedman.

25            MR. FRIEDMAN:  Thank you, your Honor.

DiGena - Cross - Mr. Friedman                    15

1    CROSS-EXAMINATION BY MR. FRIEDMAN:

2         Q    Officer, you testified a moment ago that you

3    made the observation of the movements in the vehicle

4    while you were still sitting in your car.

5              Do you recall that testimony?

6    A    Yes.

7         Q    So you weren't standing up outside the car.

8    You were behind the wheel of the cruiser you were

9    driving?

10   A    Correct.

11        Q    How far -- and you also testified, if I

12   remember correctly, that you were a few feet back?

13   A    Yes.

14        Q    What's a few feet?

15   A    Between their vehicle and my vehicle, five to ten.

16        Q    Five to ten is a pretty good spread.  Is it

17   five or is it ten?

18   A    Ten.

19        Q    Ten feet back plus the distance -- whatever

20   the distance is for the hood of your car.  Is that

21   correct?

22   A    No, from their bumper to my bumper.

23        Q    From their bumper to your bumper.  So the

24   distance of your car is an additional distance.  Isn't

25   that correct?

DiGena - Cross - Mr. Friedman                    16

1   A     Sure.

2         Q     And trunk space from their car would also add

3   some more distance.  Wouldn't that be true?

4   A     Sure.

5         Q     So probably close to like 15 feet.  Isn't

6   that true?

7   A     That sounds about right.

8         Q     Okay.  And you also testified that the car

9   that you were looking into had tinted windows.  Isn't

10  that true?

11  A     True.

12        Q     So you made these observations from a

13  distance of about 15 feet and you were looking through

14  tinted windows.  Isn't that true?

15  A     The windows were down too.

16        Q     The back window, back windshield?

17  A     The back windshield wasn't down.

18        Q     Obviously not.

19              And that was tinted, wasn't it?

20  A     Yes.

21        Q     So you made observations at a distance of

22  about 15 feet through a tinted windshield.  Isn't that

23  true?

24  A     Not entirely.

25        Q     Officer, you testified the window was tinted.

DiGena - Cross - Mr. Friedman                    17

1    Isn't that correct?

2    A    Yes.

3         Q    And you testified it was about 15 feet.

4    Isn't that correct?

5    A    Correct.

6         Q    Okay.  This was at night, wasn't it?

7    A    Yes.

8         Q    Okay.  And you can still see movement in the

9    car under those conditions?

10   A    Absolutely.

11        Q    And you can see them passing things back and

12   forth under those conditions?

13   A    Absolutely.

14        MR. FRIEDMAN:  If I can just have a moment,

15   your Honor?

16        THE COURT:  You can have a second.

17        Q    Officer, at the time the gun was recovered,

18   all four individuals were sitting on the curb?

19   A    Yes.

20        THE COURT:  That's been established.

21        Let's set a rule right now.  If somebody else

22   established it, unless there's a rumor among the

23   courthouse complex that I've gone brain dead, I got it

24   down.

25        Q    At that point all four individuals had been

1   searched?

2   A     Patted down for weapons.

3         Q     And weapons check turned up negative.  Isn't

4   that true?

5   A     True.

6         Q     There were an equal number of officers as

7   there were individuals removed from that car, true?

8   A     True.

9         Q     You weren't outnumbered.  Isn't that true?

10  A     True.

11        Q     So from the time that you removed the

12  individuals from the car and sat them on the curb, the

13  situation was very much under control.  Isn't that

14  true?

15  A     I don't know what you mean by under control.

16        Q     Well, the suspects -- no one is getting out

17  of hand, they were all under control, they were in

18  police -- informally in police custody and under

19  control.  Isn't that true?

20  A     They were seated on the curb and we were watching

21  them.  If that's under control, they were.

22        Q     Nobody was acting up.  Isn't that correct?

23  A     Correct.

24        Q     Everyone was following the instructions of

25  the police.  Isn't that correct?

DiGena - Cross - Mr. Friedman                    19

1    A    Correct.

2         Q    You told them to sit down on the curb after

3    you searched them for weapons and they did so.  Isn't

4    that correct?

5    A    Yes.

6         Q    Nobody gave you an argument.  Isn't that

7    correct?

8    A    Again, no.

9         Q    Nobody tried to run.  Isn't that correct?

10        THE COURT:  Mr. Friedman, you made your

11   point.  All right.  There's not a jury here, okay.

12        MR. FRIEDMAN:  Nothing further at this time.

13        THE COURT:  Mr. Rotella, have you any new

14   questions?

15   CROSS-EXAMINATION BY MR. ROTELLA:

16        Q    Officer, I'm going to ask you a couple of

17   questions about your interview or at least information

18   you had with regard to the lot.  Okay?

19   A    Okay.

20        Q    Now, you indicated the Galant was seen at a

21   robbery on April 26, 2004?

22   A    It was the night before.  I'm not -- I believe it

23   was the 26th.

24        Q    And what time on the 26th was it?

25   A    That the Foot Locker store was robbed?

1       Q      Yes.

2       A      I'm not sure of the exact time.  It was in the

3    evening hours.  I would say sometime between seven and

4    9 p.m.

5       Q      Now, you said that you were responsible for

6    going back and talking to the owner about a description

7    of a motor vehicle?

8    A      Correct.

9       Q      That took place the next day, on April 27th?

10   A      Correct.

11      Q      What time of day was that?

12   A      It was in the evening, sometime between the hours

13   of probably seven and eight or seven and 8:30.  I would

14   have to see the report to see exactly what time, but in

15   the evening, approximately between seven or eight, or

16   8:30.

17      Q      And what did you do with that information?

18   A      I filed a police report.

19      Q      And that information then eventually was also

20   disseminated to other units as part of your police

21   report, if you know?

22   A      Yes.

23      Q      And you described the car in the police

24   report as a silver Mitsubishi Galant, correct?

25   A      Correct.

FILED, Clerk of the Appellate Division, September 06, 2018, A-004753-16

1        Q       In the police report and in the notes that

2    went out, it talked about having front fender damage,

3    correct?

4    A       Correct.

5        Q       Didn't say anything about a headlight being

6    out?

7    A       In what report?

8        Q       Did your report say anything about a

9    headlight being out?

10   A       Which report?

11       Q       The report about the description of the

12   Mitsubishi Galant.

13   A       I don't remember specifically.  I would have to

14   see the report.

15       Q       Did you put in your report about the

16   Mitsubishi Galant?

17   A       Yes.

18       Q       Did that information get disseminated to the

19   other units?

20   A       I believe so.

21       Q       That was an important piece of information,

22   wouldn't it have been?

23   A       Yes.

24       Q       Now, when you observed the car on the 28th,

25   it was just past midnight?

Case 2:16-cv-08498-MCA Document 8-17 Filed 05/12/17 Page 22 of 44 PageID: 626

DiGena - Cross - Mr. Rotella                    22

1    A    Right.

2         Q    It was approximately a day and a half since

3    the robbery?

4    A    No, it was a day after.

5         Q    The robbery took place on the 26th?

6    A    Right, okay.  A day and a few hours.  I don't know

7    if that's a day and a half.

8         Q    Okay.  Day and a few hours.

9              There was no license plate number from the

10   report that you had describing the silver Galant?

11   A    No.

12        Q    There was nothing in the report about a

13   headlight being out?

14   A    I'm not sure.  I would have to see my report to

15   say if the headlight was.

16        Q    And the information that you had was two

17   people involved in the robbery, correct?

18   A    Correct.

19        Q    Not four people involved in the robbery?

20   A    Right.

21        Q    And the black hoody sweatshirt, is that an

22   unusual or an uncommon dress for people in Elizabeth in

23   the area?

24   A    No.

25        Q    As a matter of fact, it is quite common?

DiGena – Cross – Mr. Rotella                    23

1    A    Yes.

2         Q    Olive green, drab green jacket, again, that's

3    fairly common dress in Elizabeth in the surrounding

4    area?

5    A    Much less common.

6         Q    Much less but still common?

7    A    I don't know if I can call it common.  It is a

8    matter of opinion.  I wouldn't call it common.

9         Q    Do you remember the weather from that day?

10   A    Clear, mild night.

11        Q    Were you wearing a jacket?

12   A    No.

13        Q    You indicated that another police officer

14   went back into the vehicle after you removed the

15   occupants to search?

16   A    Yes.

17        Q    How long was he in the vehicle?

18   A    A couple minutes, I guess.

19        Q    And at the end of that couple minutes he came

20   out and said, "I got a gun"?

21   A    Within --

22        Q    Within those couple of minutes?

23   A    I would say within the first minute.

24        Q    Within the first minute.

25             Now, the occupants of the vehicle, they were

DiGena - Cross - Mr. Rotella                    24

1    obviously, we already established, outside the car.

2    Were they between your cruiser -- your cruiser pulled

3    behind their car, correct?

4    A    Correct.

5         Q    Were they between your cruiser and their car

6    or were they in front of their car?

7    A    They were in between their car and our car.

8         Q    In total, how many officers responded to that

9    scene?  Do you recall?

10   A    No.

11        Q    More than five?

12   A    Yes, not all at the same time.  They were all

13   transported separately, so you need double -- our

14   policy is two-man car transports an arrestee.  So at

15   the end of the night transporting four individuals,

16   that's at least eight officers there.

17        Q    When you call for backup, how many backup

18   units arrive?

19   A    Initially just one.

20        Q    How many officers in a backup unit?

21   A    Two.

22        Q    Was it just the four of you that removed the

23   four individuals?

24   A    Yes.

25        Q    And it was three of you watching the four

DiGena - Cross - Mr. Rotella                25

1    individuals while somebody else searched the car?

2    A     No.   A short time later, I believe, another unit

3    arrived.

4         Q     Two more?

5    A     That sounds right.

6              MR. ROTELLA:   No further questions.

7              THE COURT:   Mr. McCormack, do you have

8    anything new?

9              MR. McCORMACK:   No, no questions.

10             MS. LIEBMAN:   Your Honor, can this be marked

11   S-13?

12             (Exhibit S-13, Police report, marked for

13   identification.)

14   REDIRECT EXAMINATION BY MS. LIEBMAN:

15        Q     Officer, I'm showing you what is marked S-13

16   for identification.   Do you recognize that?

17   A     Yes.

18        Q     What is that?

19   A     This is the report that I did when I obtained the

20   information about the vehicle.

21        Q     Now, looking at that report, is there

22   information that there was damage to the right

23   headlight?

24   A     Yes.

25        Q     Is there information about the gray tinted

1  windows in that report?

2  A    Yes.

3       Q.    Now, you were asked some questions about the

4  ability to observe movements between front and rear

5  seat passengers.  Do you recall those questions?

6  A    Yes.

7       Q    First, let me ask you, did have you any

8  lights aiding you at that time?

9  A    Yes.

10      Q    What kind of lights?

11  A   Well, we have a spotlight and we also have the

12  take-down lights, in addition to the overhead lights.

13      Q    And all those lights were on?

14  A   Yes.

15      Q    When you said you made observations to the

16  inside of the car, did you make those only through the

17  rear window?

18  A   No.

19      Q    Where else did you make observations through?

20  A   Through the driver's window, driver's side window.

21      Q    How was your car positioned in relation to

22  the suspect car?

23  A   Behind it and to the left.

24      Q    You were the driver, correct?

25  A   Correct.

Case 2:16-cv-08490-MCA Document 8-17 Filed 05/12/17 Page 27 of 44 PageID: 631

1       Q      So what part of the inside of the car were

2    you able to see?

3    A      The interior, I can see to the interior.

4       Q      Those were made through the driver's side

5    window?

6    A      Yes.

7       Q      And you had indicated that window was down at

8    the time that you made these observations?

9    A      Yes.

10              MS. LIEBMAN:  Nothing further, your Honor.

11              MR. ROSANELLI:  Nothing else.

12   RECROSS-EXAMINATION BY MR. FRIEDMAN:

13       Q      Officer, when I questioned you before about

14   the position of your car relative to the position of

15   the car driven by the suspect, you testified you were

16   behind it.  Isn't that correct?

17   A      Correct.

18       Q      On redirect you testified you were behind and

19   to the left.  Isn't that correct?

20   A      Correct, but we always --

21       Q      So which is it, Officer?

22              MS. LIEBMAN:  Objection.  Can the officer

23   finish his answer?

24              THE COURT:  Sustained.

25              It is not inconsistent, it is still behind

DiGena - Recross - Mr. Friedman                    28

1    him.

2    A      It is always to the left to protect ourselves from

3    traffic when we get out of the car.  It is always

4    behind to the left, it is always behind to the left,

5    always.

6         Q      But that's not what you testified to --

7                THE COURT:  Don't argue with the witness,

8    Counsel.  Any other questions?

9                MR. FRIEDMAN:  Nothing, your Honor.

10               MR. ROTELLA:  No, Judge.

11               MR. McCORMACK:  No, Judge.

12               THE COURT:  You may step down.  Please watch

13   your step.

14               Call your next witness.

15               MS. LIEBMAN:  State calls Officer Marano.

16   F R A N K    M A R A N O, sworn.

17   DIRECT EXAMINATION BY MS. LIEBMAN:

18        Q      Sergeant, by whom are you employed?

19   A      Township of Union.

20        Q      With the police department?

21   A      Yes.

22        Q      How long have you been employed there?

23   A      Eight years.

24        Q      In what capacity?

25   A      Patrol.

Marano - Direct                                    29

1        Q       Directing your attention now to April 28,

2    2004.  Were you assigned to patrol that date?

3    A      Yes.

4        Q       Did you -- were you involved in a motor

5    vehicle stop of a silver Mitsubishi Galant on Morris

6    Avenue?

7    A      Yes.

8        Q       Approximately what time did that occur?

9    A      I believe it was right after midnight.

10       Q       Were you the car that was -- initially

11   stopped this vehicle?

12   A      No.

13       Q       How was it that you arrived on the scene?

14   A      We heard the stop over the radio.

15       Q       What information were you provided over the

16   radio? → Have to find out about that ?

17   A      That a silver Galant fitting the description from

18   an earlier robbery had been stopped.

19       Q       Were you familiar at all with the robbery?

20   A      Yes.

21       Q       How is that?

22   A      It was on -- I was on the scene the night it

23   happened.

24       Q       At the Foot Locker?

25   A      Yes.

Marano - Direct                                    30

1        Q       What information regarding the robbery did

2    you obtain when you were on the scene at the robbery of

3    the Foot Locker?

4    A       Four black male actors, ski masks, gloves,

5        Q       Any description of the car given to you at

6    that time?

7    A       Not at that time, no.

8        Q       Did you later learn -- after the robbery but

9    before the motor vehicle stop, did you learn any

10   information regarding the suspect car?

11   A       Yes.

12       Q       How is that?

13   A       There was a report filed by a witness that saw a

14   vehicle in the parking lot the night of the robbery.

15       Q    .  Was a description of the car given?

16   A       Yes.

17       Q       What was that description?

18   A       Silver Mitsubishi Galant, front-end damage, tinted

19   windows, I believe.

20       Q       And when you heard the information over the

21   radio on April 28th, shortly after midnight, did you

22   then proceed to the scene?

23   A       Yes.

24       Q       When you arrived, what happened?

25   A       We blocked the front of the vehicle in with our

Case 2:16-cv-08498-MCA   Document 8-17   Filed 05/12/17   Page 31 of 44 PageID: 635

Marano – Direct                    31

1  patrol car.

2      Q    Was the other patrol car already there on the

3  scene?

4  A    Yes, it was behind it.

5      Q    What happened then?

6  A    We exited our vehicle and --

7      Q    Let me stop you.

8          You say "we."  Were you with a partner?

9  A    Yes, Officer Bradley.

10     Q    Both of you were in uniform?

11 A    Yes.

12     Q    And this was a marked car that you took to

13 the scene?

14 A    Yes.

15     Q    When you arrived there, did the car that you

16 saw stopped match the description of the car that had

17 been described at the scene of the Foot Locker robbery?

18 A    Yes.

19     Q    How was it matched?

20 A    Silver Mitsubishi Galant with front-end damage.  I

21 don't have the report in front of me.  I believe it was

22 the passenger front.

23     Q    You said that you pulled your car in front of

24 that suspect vehicle?

25 A    Yes.

1          Q        And the suspect vehicle was stopped at this

2    time?

3    A      Yes.

4          Q        What did you do then?

5    A      Exited our vehicle and approached the occupants.

6          Q        What side of the car did you approach on?

7    A      I was on the passenger side of the vehicle.

8          Q        What observation, if any, did you make at

9    this time?

10   A      It was occupied by four black males.

11              As we walked up, we can see that there was

12   masks and gloves on the floor of the vehicle.

13         Q        When was it that you were able to make those

14   observations?  Had you gotten all the way up to the

15   side of the car at that point?

16   A      When I walked up to the vehicle, yes.

17         Q        Did you make any other observation at that

18   time?

19   A      Observation, no, but we were warned by the other

20   officers on the scene.

21         Q        What was the warning?

22   A      They told us to use caution.  It appeared the

23   occupants were handing items amongst themselves and

24   that the rear seat passengers were reaching behind

25   themselves.

Marano - Direct                                    33

1    Q    Having been given that warning, was there

2    anything specific that you did?

3    A    Once we saw the masks and gloves and having that

4    warning, we drew our weapons and ordered everyone to

5    keep their hands where we can see them.

6    Q    Did the occupants comply?

7    A    Reluctantly, yes.

8    Q    What happened then?

9    A    The occupants were removed from the vehicle.

10   Q    What did you do at that time?

11   A    I was just a cover officer at this time.

12   Q    What does that mean?

13   A    I just maintained a distance and made sure nobody

14   had any weapons, just providing cover for the other

15   officers.

16   Q    Were pat downs done of the occupants at that

17   time?

18   A    Yes.

19   Q    Was anything recovered?

20   A    No.

21   Q    What did you do then?

22   A    The occupants were seated on the sidewalk, right

23   next to the car.  And I asked the occupants what they

24   had been handing amongst themselves in the vehicle.

25   Q    What was their response?

Marano – Direct                                                    34

1   A    No response.  They said nothing. → ...

2        Q    Let me just clarify.  Did they say they

3   hadn't been passing anything or they didn't say

4   anything at all?

5   A    No, they said they weren't passing anything.

6        Q    What did do you then?

7   A    I looked in the rear seat where Officer DiGena

8   told me they were reaching and you can see that the

9   seat cushion was pulled away from the side of the

10  vehicle.

11       Q    Could you see anything else at that time?

12  A    Not at that time.

13       Q    When you made this observation of the seat

14  cushion pulled away, where were you?  Were you outside

15  the car?

16  A    I was standing in the passenger's door, outside of

17  the car looking in the vehicle.

18       Q    Was the door open or closed?

19  A    Open.

20       Q    When you saw that the seat cushion was pulled

21  away, did that have some significance to you?

22  A    Yes.

23       Q    What was that?

24  A    From what the officer had told me, that they were

25  reaching behind themselves, and them denying they

Marano - Direct                            35

1    passed anything amongst themselves, and that seat

2    cushion was pulled away, I felt that something may have

3    been hidden.

4        Q    And was that based on your training and

5    experience?

6    A    Yes.

7        Q    Had you been involved in motor vehicle stops

8    prior to this one?

9    A    Yes.

10        Q    Approximately how many?

11    A    Several hundred.

12        Q    Had you encountered this situation before

13    where a seat was pulled away and there was some kind of

14    contraband hidden?

15    A    Yes.

16        Q    Approximately how many times?

17    A    Off the top of my head I couldn't tell you, 50,

18    60.

19        Q    After making this observation about the seat

20    cushion being pulled away, what action did you take?

21    A    I reached for the seat cushion. When I pulled on

22    it, it popped out.

23        Q    You entered the passenger compartment?

24    A    I leaned in the vehicle. I wasn't physically

25    inside the car but I leaned in.

1      Q      Were you able to see anything at that time?

2   A      Yes.

3      Q      What was that?

4   A      I saw the handle of a Colt handgun with the hammer

5   back and the safety off.

6      Q      Where exactly did you see this?

7   A      Behind the seat.  Once the seat cushion popped

8   out, there was a hole in the metal work that led into

9   the trunk.  And laying right on the other side of the

10  hole was a handgun.

11     Q      By the way, was this the rear seat?

12  A      Yes.

13     Q      Do you recall whether it was the passenger

14  side or driver side?

15  A      Passenger side.

16     Q      When you then were able to see the gun, what

17  did you do?

18  A      Advised everyone there was a gun in the vehicle.

19     Q      Did you retrieve the gun?

20  A      I went around and retrieved it from the trunk.

21     Q      Why did you do that?

22  A      Safety issue.

23     Q      What kind of safety issue?

24  A      The hammer was back and the safety was off,  I

25  didn't want to reach through this hole and risk

1    discharging the firearm.  So I retrieved the keys and

2    went through the trunk to get it.

3         Q    Did you find anything else in the car?

4    A    Yes.

5         Q    What else did you find?

6    A    In the identical position on the other side,

7    behind the driver's rear seat, was a 45.

8         Q    Was that in the same condition?  Was the

9    safety off of that one as well?

10   A    Yes, safety off.

11        Q    How was it that you found that weapon?

12   A    To retrieve the first weapon we had to remove a

13   speaker box, one of the portable speaker boxes you put

14   in the trunk.  It was pushed up against the back seat.

15   We had to pull that away from the seat to retrieve the

16   first gun.

17        Q    Officer or Sergeant, in this car the seats ---

18   is this the type of car where if you pulled the back

19   seats down there's access to the trunk?

20   A    No, that's why it was so odd that it was pulled

21   away.

22        Q    Was anything else recovered from the car?

23   A    If I remember correctly, I think a knife.  I have

24   to check the report.

25        Q    Did you prepare a report in connection with

Marano -- Direct                        38

1    this matter?

2    A    Yes.

3         Q    If you look at that report, would that

4    refresh your recollection?

5    A    Yes.

6              MS. LIEBMAN:   Your Honor, if I can have an

7    item marked S-14.

8              (Exhibit S-14, Police report, marked for

9    identification.)

10        Q    Showing you what was marked S-14 for

11   identification, do you recognize that?

12   A    Yes.

13        Q    What is that?

14   A    My report.

15        Q    I ask you to take a look at that report,

16   specifically in the second page, and ask you if that

17   refreshes your recollection as to anything else that

18   may have been found in the car?

19   A    A six-inch blade, brown handled knife, six-inch

20   blade was in the driver's door pocket.

21        Q    The gloves and masks that you saw when you

22   initially approached, they were recovered as well?

23   A    Yes.

24             MS. LIEBMAN:   If I can just have one moment,

25   your Honor?

1          (Pause.)

2          MS. LIEBMAN:  I have nothing else.

3          MR. ROSANELLI:  I have no questions.

4    CROSS-EXAMINTION BY MR. FRIEDMAN:

5          Q    Officer, the report you prepared in

6    connection with this matter, which I think you have

7    been shown, you talk about the seat popping out.  Isn't

8    that correct?

9    A    Yes.

10          Q    You testified a moment ago on direct that the

11   seat popped out and gun was revealed.  Isn't that

12   correct?

13   A    Yes.

14          Q    Doesn't the report also say that you pulled

15   on the seat?

16   A    Yes, I said that.

17          Q    So the seat didn't just pop out by itself.

18          THE COURT:  He testified he pulled on it and

19   it popped out.  That's what he said.

20          Q    At that point when this was happening, all

21   four suspects were seated on the curb.  Isn't that

22   correct?

23   A    Yes.

24          Q    They had already been searched for weapons?

25   A    They were not searched, they were patted down.

Marano - Cross - Mr. Friedman                    40

1          Q      And nothing was recovered.  Isn't that

2    correct?

3    A      At that time, correct.

4               MR. FRIEDMAN:   Nothing further.

5    CROSS-EXAMINATION BY MR. ROTELLA:

6          Q      You were the cover officer?

7    A      Yes.

8          Q      That's to back up the other officers there?

9    A      Yes.

10         Q      You went to the Galant.  It was dark out?

11   A      Yes.

12         Q      Did you use your flashlight inside the

13   interior of the vehicle?

14   A      No.

15         Q      You were looking just from the dome light of

16   the vehicle?

17   A      All the police lights were on illuminating the

18   vehicle.

19         Q      And you indicated that the seat was back,

20   slightly pulled away from the seat?

21   A      Correct.

22         Q      And in looking in, you couldn't see behind

23   the seat?

24   A      No.

25         Q      You didn't shine a flashlight behind the seat

1    because you didn't have a flashlight on at the time?

2    A    Correct.

3        Q    The entire illumination was coming from the

4    lights of the police car behind the stopped vehicle?

5    A    That and our car that was facing the front of

6    them, take-down lights were shining directly into the

7    vehicle.

8        Q    So that I'm clear, and you were not able to

9    see the gun until you pulled the seat back away?

10   A    Correct.

11            MR. ROTELLA:  No further questions.

12            MR. McCORMACK:  No questions.

13            THE COURT:  You may step down.

14            Call your next witness.

15            MS. LIEBMAN:  Your Honor, those are the

16   witnesses I have regarding the motion to suppress.  The

17   other witnesses have to deal with Miranda issues, if

18   you want to go right into that.

19            THE COURT:  Yes.

20            MS. LIEBMAN:  State calls Robert Miller.

21            MR. McCORMACK:  As to Mr. McLamb, there's one

22   statement that Mr. McLamb made, I don't think there's

23   any objection.  Just make sure that's the statement I

24   think it is and I'll just sit here.

25            THE COURT:  S-1, 2, 3 and 3?

1    MS. LIEBMAN: There were two statements. One

2  was more informational.

3    THE COURT: Do you want to confirm he has the

4  statement?

5    Take a look at it.

6    (Pause.)

7    THE COURT: Mr. Rotella and Mr. Friedman, do

8  you have a problem with the Miranda?

9    MR. ROSANELLI: If I can have a moment,

10  Judge?

11    THE COURT: Sure.

12    MR. ROTELLA: I have no standing with the

13  statement.

14    MR. ROSANELLI: Judge, I have no problem with

15  the Miranda. My problem with the statement would be

16  the poisonous tree issue.

17    THE COURT: Certainly you are protected on

18  this issue and I understand this issue.

19    Mr. Friedman?

20    MR. FRIEDMAN: I think that's really my

21  position as well, Judge.

22    I'm just taking one more look through my

23  client's statement, so if I can just have one more

24  minute.

25    THE COURT: Okay.

43

1          MR. FRIEDMAN:  Judge, could I confer with my

2      client very briefly?

3          THE COURT:  Absolutely.

4          MR. FRIEDMAN:  Same position, your Honor.

5          THE COURT:  Any defense witnesses being

6      called today?

7          MR. ROSANELLI:  No, sir.

8          MR. FRIEDMAN:  No, your Honor.

9          THE COURT:  Here's what we are going to do:.

10     By next Friday I want everybody to submit their

11     argument to me in writing.  I will review my notes and

12     come up with a decision the following week.  Is that

13     okay?  Rather than just stand here because I know what

14     you will argue already, so put in it writing.

15         MR. FRIEDMAN:  Judge, I request a little more

16     time so I can obtain a copy of the transcript.

17         THE COURT:  Sure.  Two weeks.

18         MR. FRIEDMAN:  I don't know if I can get the

19     transcript that fast.

20         THE COURT:  Judy is very fast.  You want it

21     this afternoon, order daily.

22         Two weeks from tomorrow, I want your

23     submission as to various positions on the legality of

24     the stop, et cetera, reaction of the police, et cetera,

25     et cetera.  And I'll come up with a decision shortly

1    thereafter.

2         MR. FRIEDMAN:  Thank you.

3         (Matter concluded.)

4              * * * * * * * *

5         C E R T I F I C A T I O N

6         I, JUDITH L. DiANTONIO, C.S.R., License Number

7    XI00705, an Official Court Reporter in and for the

8    State of New Jersey, do hereby certify the foregoing to

9    be prepared in full compliance with the current

10   Transcript Format for Judicial Proceedings and is a

11   true and accurate non-compressed transcript to the best

12   of my knowledge and ability.

13

14   _____          6/6/05
                                       _____
15   JUDITH L. DiANTONIO, C.S.R.        Date
     Union County Courthouse
16   Elizabeth, New Jersey

17

18

19

20

21

22

23

24

25